ENTER NO JS-6

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

FILED
CLERK, U.S. DISTRICT COURT

OCT 1 9 2001

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

ENTERED
CLERK. U S DISTRICT COURT

OCT 2 2 2001

CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GERALDINE LLOYD,<br><br>       Plaintiff,<br><br>       vs.<br><br>CONSECO FINANCE CORP.,<br>CONSECO FINANCE SERVICING<br>CORP., DBA GREEN TREE<br>MORTGAGE AND DOES 1 TO 100,<br>INCLUSIVE,<br><br>       Defendants. | CASE NO. CV 00-10452 MMM(RNBx)<br><br>ORDER GRANTING IN PART<br>AND DENYING IN PART PLAINTIFF'S<br>MOTION IN LIMINE TO EXCLUDE<br>DEFENDANT'S EXPERT WITNESS<br>AND GRANTING DEFENDANT'S<br>MOTION IN LIMINE TO EXCLUDE<br>DETERMINATION BY LABOR<br>COMMISSIONER |

Geraldine Lloyd has sued her former employer, Conseco Finance Corporation, for wrongful termination in violation of public policy, specifically California Labor Code § 201 et seq. (retaliation for complaint about compensation owed but not paid) and § 98.6 (retaliation for filing a labor complaint). Lloyd's employment with Conseco began in October 1998. In August 1999, Lloyd originated a large home improvement loan ("the Williams loan"). Conseco later determined that the loan had not been properly approved before loan documents were sent to the lenders, and thus refused to pay Lloyd a commission on the loan. Lloyd alleges she notified Conseco that she intended to file a complaint with the California Labor Commissioner if she did not receive the Williams commission. She contends that Conseco warned her not to file a claim,

1 and then wrongfully terminated her on September 10, 1999, in retaliation for initiating a Labor
2 Commissioner proceeding.  Conseco contends, to the contrary, that Lloyd was fired because she
3 failed to meet the minimum loan volume requirements for her position.

4      Lloyd filed the present action in state court on August 24, 2000.  The case was removed
5 to this court on September 28, 2000.  Two motions in limine are now pending before the court.
6 Lloyd seeks to exclude the statistical analysis and opinions of Conseco's expert, Dr. Robert
7 Wunderlich.   Wunderlich has analyzed data regarding the performance of Conseco loan
8 originators, and concluded that Lloyd's termination was consistent with her performance.  He has
9 also estimated Lloyd's earnings.  Lloyd argues that Dr. Wunderlich's opinions are irrelevant and
10 not sufficiently reliable,, and should be excluded under *Daubert v. Merrell Downey Record*
11 *Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co., Ltd., v. Carmichael*, 526 U.S.
12 137 (1999).  Lloyd also asks that the opinions be excluded because they are based on data that
13 Conseco failed to produce in response to interrogatories and requests for production of documents.
14 Conseco defends the relevance and validity of Dr. Wunderlich's analysis, and contends that it
15 asserted a valid overbreadth objection to Lloyd's discovery requests.

16      Conseco, for its part, has moved to exclude a determination by the California Labor
17 Commissioner that it owed Lloyd the disputed commission.  Conseco contends that the
18 Commissioner's finding is irrelevant to the issues in this action, and that the Commissioner's
19 finding would be unduly prejudicial, especially as Conseco was not represented at the hearing at
20 which the finding was made.  Lloyd argues that the Commissioner's determination is relevant,
21 and that Conseco is estopped from contesting its validity.

## I.  FACTUAL BACKGROUND

### A.    Dr. Wunderlich's Qualifications

Dr. Wunderlich has an MBA with an emphasis in finance from the Anderson Graduate

1  School of Management at UCLA, and a Ph.D. in physics from Harvard.[1] He has been a
2  consultant on financial and economic matters for ten years, and is currently a principal at
3  Discovery Economics.[2] Dr. Wunderlich's resume indicates that he has provided expert testimony
4  on several occasions.  On only one occasion, however, has he offered opinions regarding a lost
5  earnings claim.[3]

6  **B.  Dr. Wunderlich's Opinions**

7  Dr. Wunderlich proposes to offer two expert opinions: (1) that Lloyd's termination was
8  consistent her performance; and (2) that if there should be a finding that Lloyd was wrongfully
9  terminated, lost earnings resulting from the termination are in the $15,000 to $50,000 range.

10  **C.  Bases For Dr. Wunderlich's Opinions**

11  **1.  Lloyd's Termination Is Consistent With Her Performance**

12  Wunderlich analyzed monthly summaries of the total volume of loans originated by
13  individual Conseco employees between January 1, 1999 and to May 31, 2001.[4] Based on this data,
14  he concluded that the length of time individual Conseco originators remained with the company
15  correlated with the level of their loan origination performance, and that the length of Lloyd's
16  employment was consistent with that of originators performing at or below her level.[5] Given
17  these numbers, Wunderlich thus concludes that Lloyd's termination was consistent with her
18  performance.[6]

19  At his deposition, Wunderlich stated that the summaries upon which he relied did not

21
22  [1]Plaintiff's Motion In Limine to Exclude Evidence Regarding Defendant's Expert Robert
   Wunderlich ("Pl.'s Mot."), Ex. B at 31 (Resume of Robert Wunderlich).

23  [2]*Id.*

24  [3]*Id.*

25
26  [4]Pl.'s Mot., Ex. B (Expert Report of Michael Wunderlich ("Expert Report")) at 3.

27  [5]*Id.* at 4-5.

28  [6]*Id.*

1   indicate the reason for the individual originators' termination.  Thus, he could not tell whether

2   the employees were discharged or separated from their employment voluntarily.[7]

3          2.      **Estimate Of Lost Earnings**

4          One particular measure allegedly used by Conseco in assessing the performance of its loan

5   originators is whether they produce less than $250,000 in loans in each of three consecutive

6   months.[8]  Wunderlich analyzed Lloyd's performance while at Conseco (including the Williams

7   loan) and concluded that she would have been employed at Conseco for an additional five months

8   before she recorded three consecutive months of production under $250,000.  He based this

9   calculation on data indicating that Lloyd originated at least $250,000 in loans in only two of the

10  nine full months she was employed by Conseco.  From this, he established a 2/9ths probability

11  that she would meet the $250,000 target in any given month.[9]  Using probability equations,

12  Wunderlich then estimated that Lloyd would have failed to meet the $250,000 target in each of

13  three consecutive months within five months of September 1999.[10]

14         Wunderlich tested this conclusion by running a computer simulation regarding 10,000 loan

15  officers who had a 2/9 probability of writing less than $250,000 in loans over a twenty-four

16  month period.  He states that the results were "virtually identical" to those produced by his

17  probability analysis.[11]  Wunderlich also tested the sensitivity of his calculation by changing the

18  underlying probability from 2/9ths to to 1/9th  and 3/9th, and found that the range of results

19

20

---

21         [7]Pl.'s Mot. at 3:10-17. Plaintiff does not provide the court with excerpts of the deposition

22  testimony. Defendant, however, does not dispute plaintiff's summary of Wunderlich's statements.

23         [8]Expert Report at 5.

24         [9]Declaration of Dr. Robert Wunderlich in Support Of Defendant's Supplemental

25  Memorandum Re Methodology of Defense Expert Dr. Robert Wunderlich ("Wunderlich Supp.
    Decl."), ¶ 16.

26

27         [10]*Id.,* ¶¶ 17-21.

28         [11]*Id.,* ¶¶ 22-23.

1  changed only slightly, i.e., four to seven months rather than five months.[12]

2        Having concluded that Lloyd would have remained employed for an additional five months

3  before being terminated for logging three consecutive months of production under $250,000,

4  Wunderlich calculated her lost earnings by multiplying her average monthly income while at

5  Conseco by five, and subtracting the income she actually earned during the five months following

6  her termination.  Wunderlich performed this calculation twice, excluding and including a

7  commission on the Williams loan in Lloyd's average income.  The resulting calculations of lost

8  wages were $15,093 and $16,991 respectively.  Wunderlich also calculated Lloyd's lost earning

9  for the months between her termination and the commencement of her employment at Metrociti

10  Mortgage, again excluding and including the Williams commission.  The results were $44,613

11  and $50,726 respecting.

12       **D.    The Determination Of The Labor Commissioner**

13        The parties dispute whether Lloyd filed a complaint with the California Labor

14  Commissioner regarding the Williams commission before or after she was fired by Conseco.

15  Conseco maintains that Lloyd filed her claim on September 14, 1999, four days after she was

16  discharged.[13] Lloyd asserts she lodged the complaint by telephone before she was terminated, and

17  that the Commission then sent her the paperwork necessary to file a formal complaint.  She

18  contends she was fired while the paperwork was in route to her.[14]

19       A hearing officer for the California Division of Labor Standards Enforcement held a

20  hearing on Lloyd's complaint on April 20, 2000.[15] The day before the hearing, Conseco's counsel

21  sent a facsimile to the hearing officer, requesting that the proceedings be conducted via conference

22  call.  Counsel stated that Conseco had not received notice of the hearing until April 17, 2000, and

23

24      [12]*Id.*, ¶ 24.

25      [13]Defendant's Motion to Exclude Argument and Evidence Re Determination by Labor
26  Commissioner ("Def.'s Mot.") at 3:24-26.

27      [14]Plaintiff's Opposition ("Pl's. Opp.") at 2:18-19.

28      [15]Def.'s Mot., Ex. E.

that there was insufficient time to arrange for witnesses to travel to the hearing site.[16]  The hearing

officer denied this request.[17]  On April 20, 2000, Conseco's lawyer requested, via facsimile, that

the hearing be continued.[18]  The hearing officer responded the same day, stating that the

continuance request had been received after the hearing concluded.[19]  In an order dated April 20,

2001, the California Labor Commissioner awarded Lloyd $6,049.16 in wages and penalties.[20]

Conseco paid Lloyd this amount on September 14, 2001.[21]

## II. DISCUSSION

### A.    Plaintiff's Motion To Exclude Evidence Of Wunderlich's Findings

#### 1. Admissibility Of Expert Testimony Under *Daubert* and *Kumho*

In 1993, the Supreme Court held that "Federal Rule of Evidence 702 imposes an obligation

upon a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but

reliable.'"  *Daubert*, *supra*, 509 U.S. at 589.  It thus established two tests that must be met before

expert testimony may be admitted — reliability and relevance.  *Id.* at 590-91.

The Court held that a district judge faced with a proffer of expert scientific testimony must,

at the outset, assess whether the reasoning or methodology underlying the testimony is

scientifically valid and whether it can be applied to the facts of the case at hand.  *Id.* at 592-93.

To assist the court in performing this function, the Court identified a non-exclusive list of factors

that should ordinarily be considered in evaluating the validity of an expert's scientific reasoning:

---

[16]Declaration Michael Chamberlin in Support of Defendant's Motion in Limine ("Chamberlin Decl."), Ex. A.

[17]*Id.*, Ex. B.

[18]*Id.*, Ex. C.

[19]*Id.*, Ex. D.

[20]*Id.*, Ex. E.

[21]*Id.*, Ex. F.

1  (1) whether the theory or technique can be, or has been, tested; (2) whether it has been subjected

2  to peer review and publication; (3) whether it has a known or potential rate of error; and

3  (4)whether it has been generally accepted by the scientific community. *Daubert, supra,* 509 U.S.

4  at 593-94. The Court emphasized that the analysis is a "flexible" one, and that its "overarching

5  subject" is the "evidentiary relevance and reliability . . . of the principles that underlie a proposed

6  submission." *Id.* at 594-95. "The focus" of the inquiry, it noted, "must be solely on principles

7  and methodology, not on the conclusions that they generate." *Id.* at 595.

8        Following *Daubert,* there was substantial debate as to whether its holding was limited to

9  scientific testimony, or extended to testimony based on "technical" and "other specialized

10  knowledge" as well. See FED.R.EVID. 702. This question was answered definitively by the

11  Supreme Court's decision in *Kumho. Kumho, supra,* 526 U.S. at 148 (the district court's "basic

12  gatekeeping obligation . . . applies to all expert testimony"). Thus, whether an expert's

13  knowledge is scientific, technical, or specialized, the court must determine if "the factual basis,

14  data, principles, [or] methods" that underlie the testimony "ha[ve] 'a reliable basis in the

15  knowledge and experience of the [relevant] discipline.'" *Id.* at 149. In making this assessment,

16  the court "may" consider the factors set forth in *Daubert* to the extent they are pertinent in

17  evaluating the reliability of the testimony being proffered. See *id.* at 150 ("Our emphasis on the

18  word 'may' thus reflects *Daubert*'s description of the Rule 702 inquiry as 'a flexible one.'. . .

19  *Daubert* makes clear that the factors it mentions do not constitute a 'definitive checklist or

20  test.'. . . '[T]he factors identified in *Daubert* may or may not be pertinent in assessing reliability,

21  depending on the nature of the issue, the expert's particular expertise, and the subject of his

22  testimony.'. . . [M]uch depends upon the particular circumstances of the particular case at

23  issue").

24        Because of the flexible nature of the inquiry, "the trial judge must have considerable

25  leeway in deciding . . . how to go about determining whether particular expert testimony is

26  reliable. That is to say, a trial court should consider the specific factors identified in *Daubert*

27  where they are reasonable measures of the reliability of expert testimony." *Id.* at 152. See also

28  *id.* at 153 (". . .[W]hether *Daubert*'s specific factors are, or are not, reasonable measures of

1 | reliability in a particular case is a matter that the law grants the trial judge broad latitude to
2 | determine").

3 | Ultimately, the district court must determine "whether th[e] particular expert ha[s]
4 | sufficient specialized knowledge to assist the jurors 'in deciding the particular issues in the case.'"
5 | *Id.* at 156. Thus, the court must inquire not whether the expert's basis for forming an opinion
6 | can generally be used, but whether it is properly employed in the particular case. *Id.* at 156-157.

### 2. Dr. Wunderlich's First Opinion

#### a. Relevance

9 | The first of the *Daubert* tests is whether proffered expert testimony is relevant. *Daubert*,
10 | *supra*, 509 U.S. at 590-91. Rule 401 defines "relevant evidence" as "evidence having any
11 | tendency to make the existence of any fact that is of consequence to the determination of the
12 | action more probable or less probable than it would be without the evidence." FED. R. EVID. 401.

13 | Lloyd asserts that Conseco seeks to admit Wunderlich's opinion that her termination was
14 | statistically consistent with her performance to prove the cause of her discharge. It is true that
15 | Wunderlich in his report states that he has concluded that "Lloyd's termination was consistent
16 | with her performance and the treatment of other Conseco loan originators."[22] Moreover, in its
17 | initial opposition to Lloyd's motion, Conseco asserted that "Wunderlich [would] testify that the
18 | statistical evidence supports Defendant's contention that Plaintiff's termination was the result of
19 | her *performance* at Conseco rather than retaliation for any complaint she made." In a declaration
20 | filed in response to Lloyd's supplemental brief on this issue, however, Wunderlich does not
21 | identify causation as the focus of his opinion. Rather, he states that his analysis serves to test
22 | Lloyd's hypothesis that her "employment with Conseco ended earlier than it otherwise would
23 | have."[23] The court will consider each of these proffered bases in turn.

---

[22]Expert Report at 4.

[23]Declaration of Robert Wunderlich in Support of Defendant's Response to Plaintiff's
Supplement to Motion in Limine ("Wunderlich Resp. Decl."), ¶ 13.

### 1.   Causation

First, the cause of Lloyd's termination is not only relevant, but central, to her retaliation claim.  In the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the plaintiff must first prove a *prima facie* case, i.e., that she engaged in protected activity, that she suffered an adverse employment decision; and that a causal connection existed between her activity and the employment decision.  *Folkerson v. Circus Circus Enterprises, Inc.*, 107 F.3d 754, 755 (9th Cir. 1997); *Trent v. Valley Electric Ass'n, Inc.*, 41 F.3d 524, 526 (9th Cir. 1994).  If Lloyd makes such a showing, the burden will then shift to Conseco to articulate a legitimate, non-discriminatory reason for the employment action.  *Id.*  "To satisfy this burden, the employer 'need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus.'"  *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 731 (9th Cir. 1986) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 257 (1981)).  Presumably, Conseco intends to proffer evidence that it terminated Lloyd for poor performance.   Assuming this burden of production is met, the burden of proof will then shift back to Lloyd to demonstrate Conseco's asserted reason is a mere pretext for the action taken.  *McDonnell Douglas*, *supra*, 411 U.S. at 804.  It is here that Wunderlich's opinion that Lloyd's termination was consistent with her level of performance has relevance.

The question, however, is whether the proffered opinion evidence satisfies the "fit" requirement of *Daubert*.  In *Daubert*, the Supreme Court noted that the question of relevance is whether the evidence is sufficiently tied to the facts of the case that it will assist the jury in resolving the issues before them.  It continued:

> "The consideration has been aptly described . . . as one of 'fit.' . . . 'Fit' is not
> always obvious, and scientific validity for one purpose is not necessarily scientific
> validity for other, unrelated purposes. . . .   Rule 702's 'helpfulness' standard
> requires a valid scientific connection to the pertinent inquiry as a precondition to
> admissibility. . . . [¶] Unlike an ordinary witness, . . . an expert is permitted wide
> latitude to offer opinions, including those that are not based on firsthand knowledge

1   or observation. . . . Presumably, this relaxation of the usual requirement of

2   firsthand knowledge – a rule which represents 'a "most pervasive manifestation"

3   of the common law insistence upon "the most reliable sources of information,"'

4   . . . – is premised on an assumption that the expert's opinion will have a reliable

5   basis in the knowledge and experience of his discipline." *Daubert, supra,* 509

6   U.S. at 591-92.

7   As stated by the Ninth Circuit on remand in *Daubert,*

8   "The Supreme Court recognized that the 'fit' requirement 'goes primarily to

9   relevance,' . . . but it obviously did not intend the second prong of Rule 702 to be

10   merely a reiteration of the general relevancy requirement of Rule 402.   In

11   elucidating the 'fit' requirement, the Supreme Court noted that scientific expert

12   testimony carries special dangers to the fact-finding process because it '"can be

13   both powerful and quite misleading because of the difficulty in evaluating it."' . . .

14   Federal judges must therefore exclude proffered scientific evidence under Rules 702

15   and 403 unless they are convinced that it speaks clearly and directly to an issue in

16   dispute in the case, and that it will not mislead the Jury." *Daubert v. Merrell Dow*

17   *Pharmaceuticals, Inc.,* 43 F.3d 1311, 1321, n .17 (9th Cir. 1995).

18   In *Daubert,* plaintiffs offered statistical evidence to prove that their birth defects were

19   caused by their mothers' ingestion of Benedictin during pregnancy. *Id.* at 1320-22. The Ninth

20   Circuit concluded that the evidence showed, at most, "that Bendectin could *possibly* have caused

21   plaintiffs' injuries.'" *Id.* at 1322. Consequently, the court concluded that the testimony was

22   "inadmissible under the second [or relevance] prong of Fed.R.Evid. 702." *Id.*

23   The same problems plague Wunderlich's opinion that "Lloyd's termination was consistent

24   with her performance and the treatment of other Conseco loan originators,"[24] i.e., that statistical

25   evidence "supports [Conseco's] contention that [Lloyd's] termination was the result of her

26   *performance* at Conseco rather than retaliation for any complaint she made." To rebut Lloyd's

27

28   [24]Expert Report at 4.

1    retaliation claim, Conseco must prove that *her* termination was the result of poor performance,

2    not that others were discharged for performing at or about the same level.  Wunderlich cannot

3    testify that *Lloyd* was terminated because of poor performance, only that individuals with similar

4    performance left the company after working there approximately the same number of months as

5    Lloyd had at the time of her termination.  Given the fact that his opinion does not "speak[ ]

6    clearly and directly to [the] issue in dispute," and given the resulting potential for juror confusion,

7    the opinion is inadmissible under the relevance prong of *Daubert* when offered to prove that poor

8    performance caused Lloyd's termination.

9           The relevance of Wunderlich's opinion regarding causation is further undermined by the

10   fact that he included in his study individuals who left Conseco voluntarily as well as individuals

11   whose employment was terminated.  Evidence in the record suggests that more than 90% of the

12   employees analyzed by Wunderlich terminated their employment voluntarily.[25]  "'[A] statistical

13   study that fails to correct for salient explanatory variables, . . . has no value as causal explanation

14   and is therefore inadmissible in a federal court.'"  *United States v. Artero*, 121 F.3d 1256, 1262

15   (9th Cir. 1997) (quoting *People Who Care v. Rockford Board of Ed.*, 111 F.3d 528, 537-38 (7th

16   Cir. 1997)).  While Conseco asserts that loan production was the key factor in each employee's

17   decision to leave, many variables may have contributed, and Wunderlich apparently made no

18   effort to screen for other causes.  Without such screening, equating voluntary terminations and

19   involuntary discharges fails to account adequately for potentially explanatory variables, and to

20   provide opinion testimony relevant to the issue in the case – whether *Lloyd* was terminated

21

22         [25]Conseco Area Manager Rick Mount testified:

23         "Mr. Silverman: . . . You've testified that the average tenure was about a year but
           mentioned that only 2 or 3 or so were terminated.  I gather that means a lot of
24         people quit?

25         The Witness: A majority of the people I would say 90 percent or more voluntarily
           left.

26         Q: Okay.  And do you have an opinion based on your experience in working with
           these people why people who quit, tended to quit?
27
           A: I would say almost all of the time it was because they weren't achieving the
28         production levels that we look for."  Silverman Decl., Ex. A.

11

1   because of poor performance or in retaliation for filing a Labor Commissioner complaint.  This

2   provides yet another basis upon which to exclude Wunderlich's causation opinion under the

3   relevance prong of *Daubert*.  See *Bickerstaff v. Vassar College*, 146 F.3d 435, 449 (2d Cir. 1999)

4   ("The critical distinction that Bickerstaff misses . . . is that in the present case the district court

5   did not reject Gray's regression analysis because it included less than all the relevant variables;

6   rather, it found the evidence not probative because it omitted the major variables. . . . Thus, as

7   we explain below, Gray's statistical analysis falls within the . . . exception . . . that '[t]here may

8   . . . be some regressions so incomplete as to be inadmissible as irrelevant").

9   ### 2.  Damages

10   Wunderlich's opinion regarding the consistency between Lloyd's level of performance and

11   her length of time at the company is also offered to prove the damages Lloyd suffered if in fact

12   her termination was retaliatory.  Lloyd intends to call an expert whose opinion regarding lost

13   wages is based on the assumption that Lloyd would have remained employed at Conseco for 5

14   years.[26]  If, as of the date of her termination, Lloyd's length of employment was equal to or

15   greater than the average for loan originators, Wunderlich's opinion will tend to cast doubt on the

16   assumption plaintiff's expert used, and tend to prove that she is entitled to a smaller damages

17   award than Lloyd's expert contends.

18   Lloyd's claim for termination in violation of public policy is based on California Labor

19   Code § 98.6.  That statute provides: "Any employee who is discharged . . . because such

20   employee has made a bona fide complaint or claim to the division pursuant to this part shall be

21   entitled to reinstatement and reimbursement for lost wages and work benefits caused by such acts

22   of the employer."  CAL. LABOR CODE § 98.6.  There is little case law addressing the proper

23   measure of damages for a termination in violation of public policy claim.  It appears, however,

24   that it is generally the same as that utilized in Title VII cases.  See *Raven v. Oakland Unified*

25   *School District*, 213 Cal.App.3d 1347, 1367 (1989) (" It is well settled that public policy favors

26   full backpay upon reinstatement and that backpay should be given from the time of the 'unlawful

27   _____

28   [26]See Declaration of B. Scott Silverman ("Silverman Decl."), Ex. B.

1    discharge'"). Under this standard, Lloyd's entitlement to back pay is "measur[ed by] the

2    difference between actual earnings for the period and those which she would have earned absent

3    the discrimination by defendant,'" *Gotthardt v. National Railroad Passenger Corp.*, 191 F.3d

4    1148, 1158 (9th Cir. 1999) quoting *Horn v. Duke Homes*, 755 F.2d 599, 606 (7th Cir. 1985) and

5    *Taylor v. Philips Industries, Inc.*, 593 F.2d 783, 786 (7th Cir. 1979) (per curiam)). Generally,

6    a plaintiff is entitled to an award of back pay from the date of the discriminatory or retaliatory

7    termination through the date of judgment. See *Saulpaugh v. Monroe Community Hospital*, 4 F.3d

8    134, 144 (2d Cir. 1993) *Dunlap-McCuller v. The Riese Organization*, 980 F.2d 153, 159 (2d Cir.

9    1992). Where there is evidence that lost wages between termination and judgment were caused

10   by something other than the wrongful act, however, a lesser award is appropriate. In *Saulpaugh*,

11   for example, plaintiff became disabled after her retaliatory discharge by defendants. The court

12   held that she could recover back pay only for the period prior to the onset of her disability,

13   because she was "only entitled to losses suffered as a result' of defendants' discrimination."

14   *Saulpaugh*, *supra*, 4 F.3d at 145. In an even more analogous case, the First Circuit tacitly

15   approved the district court's consideration of evidence as to whether plaintiffs would have

16   remained employed at the defendant company during the entire period for which back pay was

17   available. The trial judge found not credible the company's assertion that it work was cyclical,

18   that it decreased immediately following plaintiffs' termination, and thus that they would not have

19   remained employed for the entire back pay period. The circuit court affirmed this finding,

20   holding that "[i]t was not . . . clear error" for the court to assume "that, but for their retaliatory

21   discharges, they both would have retained their jobs for the entire stipulated period." *Reich v.*

22   *Cambridgeport Air Systems, Inc.*, 26 F.3d 1187, 1189-90 (1st Cir. 1994). See also *Gotthardt*,

23   *supra*, 191 F.3d at 1158 (holding that the district court's finding that plaintiff failed to show "that

24   [her] lost work could be attributed to Amtrak's unlawful conduct," as she "did not present

25   evidence of the number of hours that she would have worked 'but for' the alleged discriminatory

26   conduct by Amtrak" was not clearly erroneous). Here, Wunderlich's study contains evidence

27   regarding the average length of time loan originators performing at, above or below Lloyd's level

28   remained employed at Conseco. This evidence is relevant to the size of any award of back pay

1  Lloyd should receive.

2              **b.     Reliability**

3          As respects the second *Daubert* factor – reliability – Conseco cautions that the court's

4  focus must be on methodology, not the conclusions it generates. *Daubert*, *supra*, 509 U.S. at

5  595. It argues that Wunderlich used a straightforward mathematical analysis and that there is no

6  reason to exclude his conclusion as a result. In assessing this contention, it is important to keep

7  in mind that the Supreme Court in *Daubert* spoke of "evidentiary reliability" as opposed to

8  scientific reliability or validity. See *Daubert*, *supra*, 509 U.S. at 590, n. 9 ("We note that

9  scientists typically distinguish between 'validity' (does the principle support what it purports to

10 show?) and 'reliability' (does application of the principle produce consistent results?). . . .

11 Although 'the difference between accuracy, validity, and reliability may be such that each is

12 distinct from the other by no more than a hen's kick,' . . . our reference here is to evidentiary

13 reliability – that is, trustworthiness. . . . In a case involving scientific evidence, evidentiary

14 reliability will be based upon scientific validity").

15         Generally, disputes regarding the validity of statistical evidence such as that Conseco seeks

16 to present affect its weight rather than its admissibility. *Mangold v. California Public Utilities

17 Comm'n.*, 67 F.3d 1470, 1476 (9th Cir. 1995) ("The statistics measured scores on relevant

18 promotional examinations and included the entire pool of test-takers. Dr. Blecha's assumptions

19 and the composition of the promotion pools went towards the weight, not the admissibility, of the

20 statistical evidence. The PUC cross-examined Dr. Blecha fully on these points"); *McAlester v.

21 United Air Lines, Inc.*, 851 F.2d 1249, 1259 (10th Cir. 1988) ("Although United developed

22 through cross-examination that failure to consider [variables] may result in skewed statistical

23 results, the weight to be accorded this statistical evidence is the province of the jury which we will

24 not invade where there is no showing of manifest error. [¶] We conclude that each of United's

25 alleged flaws in the statistical evidence went to the weight of that evidence, not its admissibility.

26 The district court did not abuse its discretion in admitting the expert's statistical analysis of the

27 terminations for both the ramp service and the whole Denver facility"). See also, e.g., *Collings

28 v. Industrial Acoustics Co., Inc.*, 2001 WL 913909, * 4 (S.D.N.Y. Aug. 13, 2001) ("IAC's

1    arguments about the probative force of Collings' statistical analysis go primarily to the weight of

2    the evidence, and not to its admissibility, and are therefore appropriately made to a jury, which

3    may well accept them"); *MTX Communications Corp. v. LDDS/WorldCom, Inc.*, 132 F.Supp.2d

4    289, 293 (S.D.N.Y. 2001) ("as a general proposition, defects in methodology go to the weight

5    of the evidence and not its admissibility"); *Schanzer v. United Technologies Corp.*, 120

6    F.Supp.2d 200, 214 (D. Conn. 2000) ("The cases cited by defendant are not to the contrary, in

7    that they address the weight of such evidence, not its admissibility.  The court in *Haskell v.*

8    *Kaman Corp.*, 743 F.2d 113, 119 (2d Cir.1984) simply discussed general principles regarding

9    the use of statistics in discrimination cases alleging failures to promote, noting that statistics may

10   be undermined by considerations such as small sample size, and observing that 'evidence showing

11   that the figures for the general population might not accurately reflect the pool of qualified

12   applicants would also be relevant'"); *In re Bank of Louisiana/Kenwin Shops Inc.*, 1999 WL

13   1102619, * 1 (E.D. La. Dec. 1, 1999) ("While BOL contends . . . that Bloom's analysis is

14   statistically flawed, '[s]tatistical procedures can increase the court's confidence in making

15   inferences from a given set of data. . . . [T]his is an issue of weight, rather than admissibility of

16   a given methodology").

17          In evaluating scientific validity, and hence evidentiary reliability, the court is required to

18   taken into consideration various factors, including the technique used by the expert has been tested

19   for validity, whether the technique has been subjected to peer review, whether there is a high

20   known potential for error, and whether "the factual basis, data, principles, [or] methods" that

21   underlie the opinion "ha[ve] 'a reliable basis in the knowledge and experience of the [relevant]

22   discipline.'" *Kumho, supra*, 526 U.S. at 149.

23          Lloyd also complains that Wunderlich's data is not valid, as he has provided no

24   information regarding the statistical significance of his numbers, or addressed such measures of

25   statistical significance as standard deviation[27] or P-value.[28]  Stated otherwise, Lloyd asserts that

26

27          ──────────────

28          [27]"The standard deviation measures the variability, or dispersion, of a batch of numbers.
     If all the numbers are the same, the standard deviation is zero.  If many of the numbers are far

1  Wunderlich has not revealed the likelihood that his numbers are the result of chance, rather than
2  the cause he ascribes to them.

3  Wunderlich responds that he performed a number of tests to determine the statistical
4  significance of the numbers he developed – standard deviation tests, frequency histograms,
5  scattergrams, regression analyses, random sampling and hypothesis testing.[29]  As respects
6  hypothesis testing, Wunderlich states that, because Lloyd's length of employment was greater than
7  that of originators with similar performance, "it can immediately be concluded, without any
8  further calculations that the data do not support the hypothesis that Ms. Lloyd's [length of service
9  with the company] was shorter than it otherwise would have been."[30]  Similarly, with respect to
10  regression analysis, Wunderlich states that Lloyd was "above the regression trend line," because
11  she was employed longer than would be expected based on her performance.[31]  Finally, as
12  respects standard deviation, Wunderlich states that, whatever confidence level is selected, the fact
13  that Lloyd's length of employment was above the mean means that the hypothesis that she was
14  terminated sooner than would otherwise have been the case cannot be proved.[32]

15  Based on the record presently before the court, it appears that Wunderlich used statistical
16  methods that have been adequately tested and subjected to peer review.  They are well known

17  _____

18  from the mean for the entire set, the standard deviation is zero."  D.H. Kaye, *Is Proof of*
19  *Statistical Significance Relevant?*, 61 Wash L. Rev. 1333, 1335, n.13 (1986).

20  [28]P value is the probability of obtaining the observed results if hypothetical conditions had
    been in existence.  For example, in a jury discrimination case, a county with a population that is
21  ten percent African-American may have prepared a list of jurors only five percent of whom are
    African-American.  From this list a jury pool of seventeen whites and three blacks is randomly
22  selected.  The P-value here would be the probability that the same result would have arisen had
23  a panel reflecting the actual percentage of African-Americans in the populace been used.  *Id.* at
    1138-39.

24
25  [29]Wunderlich Resp. Decl., ¶¶ 3-19.

26  [30]*Id.*, ¶ 15.

27  [31]*Id.*, ¶ 18.

28  [32]*Id.*, ¶¶ 22-27.

1  within the relevant discipline, and the potential for error in Wunderlich's particular application

2  of the principles is an appropriate subject for cross-examination, not a basis for the exclusion of

3  his testimony.  Offered to prove the length of time on average that loan originators remained with

4  the company, the evidence is sufficiently reliable to satisfy *Daubert*.

5      For this reason, the court will permit Wunderlich to testify to his analysis of the average

6  length of time loan originators remained employed at Conseco.  He may not correlate length of

7  employment to loan production, testify that Lloyd's termination was caused by her poor

8  performance or opine that her termination was "consistent with her level of performance."

9  Similarly, in stating his opinions, Wunderlich must use terminology that does not lead the jury

10  to believe that employees who departed voluntarily were in fact involuntarily terminated.

11          **3.    Dr. Wunderlich's Second Opinion**

12              **a.    Relevance**

13      In an effort to address Lloyd's possible damages in the event she was wrongfully

14  terminated, Wunderlich also opines that Lloyd would have been terminated within five months

15  of her actual termination in September 1999.  Wunderlich bases this conclusion on an analysis of

16  the statistical probability that after an additional five months at the company, Lloyd would once

17  again have recorded less than $250,000 in loans for three consecutive months.

18      As noted above, Lloyd is entitled recover as damages the wages she would have earned

19  "but for" the alleged retaliatory conduct of Conseco.  Evidence regarding the length of time she

20  would probably have remained employed at the company is thus relevant in assessing the damages

21  to which she is entitled.  Wunderlich's opinion that Lloyd would have been terminated within five

22  months is directly relevant to this calculation.  Thus, the first prong of *Daubert* is satisfied.

23              **b.    Validity**

24      Lloyd challenges the validity of three assumptions that underlie Wunderlich's conclusion

25  that she would have been terminated in five months.  First, she asserts that Conseco does not have

26  a policy of terminating originators who produce less than $250,000 in loans for each of three

27  consecutive months.  Conseco has represented that there will be testimony to this effect, and it

28  is entitled to have its expert rely on its version of the evidence in formulating and stating an

17

opinion.  See *United States v. Barnette*, 800 F.2d 1558, 1568-69 (11th Cir. 1986) ("Agent Knee may have been selective in relying on certain evidence while rejecting other evidence, but that was within his domain as an expert witness"), cert denied, 480 U.S. 935 (1987).[33]  See also *Greenwell v. Boatwright*, 184 F.3d 492, 497 (6th Cir. 1999) ("Expert testimony, however, is inadmissible when the facts upon which the expert bases his testimony contradict the evidence"); *Toucet v Maritime Overseas Corp.*, 991 F.2d 5, 10 (1st Cir. 1993) ("While a hypothetical should include only those facts supported by the evidence, . . . the record here indicates that sufficient facts existed to support the challenged hypothetical"); *Allstate Ins. Co. v. Hugh Cole Builder, Inc.*, 137 F.Supp.2d 1283 (M.D. Ala. 2001) (noting that there was a sufficient factual basis in the record to support the expert's opinion).  If the jury disbelieves Conseco's claim that it terminates originator who produce less than $250,000 in loans for three consecutive months, it will disregard Wunderlich's estimate as well.

Lloyd next objects to Wunderlich's assumption that her future performance would follow the pattern of her past performance.  Wunderlich utilized standard probability analysis to determine when Lloyd would next have gone three months without producing at least $250,000 in loans.  While the opinion is, consequently, theoretical, it is neither unreliable nor invalid.  Wunderlich relied on evidence that Lloyd met the production goal in two of the nine months she worked at the company in 1999.  Using this baseline data, he calculated the probability that a three month sequence below minimum production targets would end in a particular month.  He then tested his findings using simulation and sensitivity analysis.[34]  The methodology utilized has been adequately tested and subjected to peer review.  It is well known within the relevant discipline, and any fallacy in the underlying assumptions can be highlighted by plaintiff on cross-examination.  Certainly, Lloyd has not met her burden of proving otherwise, offering only the

---

[33]Other aspects of the *Barnette* holding were subsequently superseded by amendment of 18 U.S.C. § 3663(a)(3).  See *Blaik v. United States*, 117 F.3d 1288, 1293 (11th Cir. 1997), opinion vacated on reh'g., 161 F.3d 1341 (11th Cir. 1998).

[34]*Wunderlich Supp. Decl.*, ¶¶ 9-12, 13-14.

1 conclusory assertion that Wunderlich used "invalid reasoning and technology" to arrive at the five

2 month estimate.[35]

3     As the evidence before the court does not reveal that Wunderlich utilized invalid or

4 untested methodology, his opinion regarding the length of time Lloyd would have remained

5 employed before recording three consecutive months of below-$250,000 production is not

6 inadmissible under *Daubert*. See *Adams v. Ameritech Services, Inc.*, 231 F.3d 414, 428 (7th Cir.

7 2000) (in age discrimination case, failure of statistical analysis to take into account or control for

8 non-age related variables went to its weight, not its admissibility); *Flebotte v. Dow, Jones & Co.,*

9 *Inc.*, 2000 U.S. Dist. LEXIS 19875, * 9-10 (D. Mass. 2000) ("Although the disputed statistical

10 analyses may be subject to the various flaws indicated by the defendant, such imperfections affect

11 their probative value rather than their admissibility").

12         **4.    Conseco's Discovery Responses Do Not Warrant Exclusion Of**

13         **Wunderlich's Opinions**

14     Lloyd also argues that Wunderlich's opinions should be excluded because Conseco

15 interposed overbreadth and privacy objections to interrogatories and requests for production of

16 documents that concerned the data on which Wunderlich relies.[36] When a party asserts improper

17 objections or offers evasive responses to discovery requests, the proper procedure is to file a

18 motion to compel under Rule 37(a) of the Federal Rules of Civil Procedure. In the absence of

19 such a motion and a resulting discovery order, sanctions can be imposed under Rule 37(d) only

20 where a party has failed to respond at all, or its objections are completely without merit. *Fjelstad*

21 *v. American Honda Motor*, 762 F.2d 1334, 1339-40 (9th Cir. 1985).

22 ⎯⎯⎯⎯⎯⎯⎯⎯

23     [35]See Pl.'s Mot. at 4:20. In her supplement to the motion in limine, Lloyd complains that
Wunderlich did not use standard deviation, p value or other techniques to test the results obtained.

24 Lloyd provides no expert declaration or other evidence that demonstrates such tests must be

25 performed in order to render the results reliable and valid. Moreover, as discussed above in
considering the admissibility of Wunderlich's first conclusion, the lack of these tests, if they were

26 not performed, goes to the weight of the evidence, not its admissibility.

27     [36]Pl.'s Mot., Ex. C, Special Interrogatory No. 22 and Response thereto; Requests for

28 Production Nos. 43 and 44 and Responses thereto.

1    Lloyd's discovery requests sought disclosure of instances in which a Conseco employee

2    had violated any policy "applied to [her] termination," and asked that Conseco provide the name

3    of the violator, the date of the violation, and how it occurred.[37]  Lloyd also sought documents

4    reflecting the loan volume produced by all Conseco originators during the prior five years.[38]

5    Although not satisfied with Conseco's responses, Lloyd did not file a motion to compel production

6    of the information it sought.

7    Wunderlich's analysis relied on origination records covering a two and a half year period.

8    The records reflected instances in which employees had failed to originate loans totaling $250,000

9    in each of three consecutive months, but did not reveal the names of the originators involved.  As

10   the records provided to Wunderlich were narrower in scope than those requested by Lloyd, and

11   as they were presented in a manner that was consistent with Conseco's privacy objection,

12   Conseco's provision of information to Wunderlich was substantially consistent with the objections

13   it asserted to Lloyd's requests.   The objections are not facially meritless, and an evidence

14   preclusion order under Rule 37(d) is not warranted as a result.

15   **B.**     **Defendant's Motion To Exclude Evidence Of The Labor Commissioner's**

16            **Determination**

17   Conseco has moved to exclude evidence of the California Labor Commissioner's

18   determination that Conseco wrongfully failed to pay Lloyd a commission on the Williams loan.

19   It argues that the Labor Commissioner's finding that Lloyd was entitled to the commission is not

20   relevant in determining whether she was fired in retaliation for having made the complaint or as

21   a result of poor performance.   It also asserts that admission of the evidence would unduly

22   prejudice the jury against it, and confuse the issues at trial by suggesting that the Labor

23   Commissioner had already decided the issue at hand.  Finally, it contends that the probative value

24   of the Labor Commissioner's determination is undermined, and its prejudicial nature enhanced,

25   by the fact that Conseco was not represented at the administrative hearing.

26   _____

27   [37]Special Interrogatory No. 22

28   [38]Request for Production Nos. 43 and 44.

1    Lloyd counters that Conseco is estopped from denying the validity of the Labor
2    Commissioner's decision, and further that the fact Conseco wrongfully refused to pay the
3    commission is probative of the real reason it terminated her.

4    Lloyd's argument that the decision will tend to prove the pretextual nature of Conseco's
5    stated reason for firing her confuses two issues. While perhaps related, whether Lloyd was
6    entitled to a commission on the loan is a different question than whether the loan should have been
7    counted in her monthly production statistics. Conseco asserts the evidence will show that Lloyd
8    violated company policy by sending loan documents to the borrowers before obtaining internal
9    approval from her superiors within the company. The loan was ultimately funded because the
10   borrowers threatened litigation.

11   The Labor Commissioner relied on two items of documentary evidence in determining
12   whether Lloyd was entitled to a commission on the loan – Lloyd's commission statement, which
13   showed the commission rate she was paid for loans over $500,000, and a settlement statement for
14   the Williams loan, which showed that the loan was funded on August 11, 1999. In addition,
15   Lloyd testified that she was the loan officer who worked on and closed the loan.[39] No evidence
16   was presented, and no findings made, as to whether Lloyd followed proper procedure in
17   originating the loan, nor whether she was entitled to have it counted in her monthly production
18   statistics. Similarly, no findings were made regarding the cause of Lloyd's termination. Thus,
19   the Labor Commissioner did not address the issues relevant to decision of Lloyd's present claim
20   – whether she met production targets and whether she was terminated for poor performance or
21   some other reason. At best, therefore, the Labor Commissioner's determination that Lloyd should
22   receive a commission on the Williams loan is tangentially relevant to the issues in suit.

23   Lloyd argues that Ninth Circuit precedent requires that evidence of the Labor
24   Commissioner's determination be admitted, citing *Plummer v. Western Int'l Hotels Co., Inc.*, 656
25   F.2d 502 (1981). The *Plummer* court held that an EEOC probable cause determination was
26   improperly excluded in a Title VII suit because it was probative on the issue of discrimination,

27

28   [39]Chamberlin Decl., Ex. E.

1  and because "[a] civil rights plaintiff has a difficult burden of proof, and should not be deprived

2  of what might be persuasive evidence." *Plummer, supra*, 656 F.2d at 504-05.  *Plummer is*

3  inapposite, as the agency determination there at issue addressed the very issue in dispute in federal

4  court, e.g., whether the employer had discriminated.  Moreover, *Plummer* was later limited in

5  *Gilchrist v. Jim Slemens Imports, Inc,* 803 F.2d 1488 (9th Cir. 1986), which held that *Plummer*'s

6  rule of *per se* admissibility did not extend to letters of violation issued by the agency:

7     "A finding of probable cause does not suggest to the jury that the EEOC has

8     already determined that there has been a violation.   Rather, it suggests that

9     preliminarily there is reason to believe that a violation has taken place. . . .  A

10    letter of violation, however, represents a determination by the EEOC that a

11    violation of the Act has occurred and thus results in a much greater possibility of

12    unfair prejudice.  A jury may find it difficult to evaluate independently evidence

13    of age discrimination after being informed that the EEOC has already examined the

14    evidence and found a violation." *Gilchrist, supra*, 803 F.2d at 1500.

15 See also *Beachy v. Boise Cascade Corp.*, 191 F.3d 1010, 1015 (9th Cir. 1999) (applying *Gilchrist*

16 rule to a finding of no probable cause, as this represented a final determination).  Cf. *Lathem v.*

17 *Dep't of Children and Youth Services*, 172 F.3d 786, 791 (11th Cir. 1999) (holding, as respects

18 EEOC determinations, that in jury trials district courts must "make the admissibility determination

19 on an individual basis, considering the evidence's probative value and the danger of unfair

20 prejudice").

21    Here, as noted, the Labor Commissioner neither preliminarily or finally decided that

22 Lloyd's discharge was retaliatory, nor that she should have been given credit for the Williams

23 loan in computing her monthly production.  To the extent the decision has relevance to these

24 questions, it is more akin to the final determination in *Gilchrist* than the preliminary determination

25 in *Plummer*, and carries with it the same potential for unfair prejudice noted by the *Gilchrist*

26 court.   Assuming, therefore, that the decision has some marginal relevance, it is properly

27 excluded under Rule 403 of the Federal Rules of Civil Procedure, as its probative value is slight,

28 and the danger of unfair prejudice and juror confusion is great.

1    Lloyd contends that Conseco is collaterally estopped from seeking exclusion of the Labor

2    Commissioner's determination.   Lloyd is correct that Conseco is estopped from denying the

3    validity of the Commissioner's finding that she is entitled to a commission on the Williams loan.

4    That, however, is not the issue before the court in this case.

5    Under California law, several threshold requirements must be met before collateral

6    estoppel will bar relitigation of an issue: (1) the issue as to which preclusion is sought must be

7    identical to the issue decided in the former proceeding; (2) the issue must have been actually

8    litigated in the prior proceeding; (3) the issue must necessarily have been decided in the prior

9    proceeding; (4) the decision in the earlier proceeding must have been final and on the merits; and

10   (5) the party against whom preclusion is sought must be the same as, or in privity with, a party

11   to the former proceeding. *Branson v. Sun-Diamond Growers, supra*, 24 Cal.App.4th 327, 341

12   (1994). See also *Lucido v. Superior Court*, 51 Cal.3d 335, 341 (1990).[40]

13   Here, the proceeding before the Labor Commission involved the parties to this suit.  The

14   issue of Lloyd's entitlement to a commission on the Williams loan was properly raised, and

15   determined by the hearing officer in that proceeding.   Thus, it was actually litigated.   See

16   *Castillo, supra*, 111 Cal.Rptr.2d at 875 (defining "actually litigated").  Similarly, decision of the

17   question was not entirely unnecessary to the Labor Commissioner's decision, and the third

18   preclusion criterion is thus satisfied as well.   *Id.*   While Conseco was not represented at the

19   hearing, a party is bound by an administrative ruling even where it fails to defend or introduce

20   evidence in the hearing, so long as it had an opportunity to do so.   *People v. Sims*, 32 Cal.3d

21   468, 481 (1982).   Conseco was given notice of the administrative hearing, and California Labor

22   Code § 98.6(f) required the hearing officer to proceed in Conseco's absence.   CAL. LABOR CODE

23   § 98.6(f) ("If the defendant fails to appear or answer within the time allowed under this chapter,

24   _____

25    [40]Issue preclusion "bars the relitigating of issues which were previously resolved by an
     agency acting in a judicial capacity." *Castillo v. City of Los Angeles*, 111 Cal.Rptr.2d 870, 875

26   (2001) (quoting *Knickerbocker v. City of Stockton*, 199 Cal.App.3d 235, 242 (1988)). "[U]nless
     a party to quasi-judicial proceeding challenges the agency's adverse findings made in that

27   proceeding, by means of a mandate action in superior court, those findings are binding in later

28   civil actions." *Johnson v. City of Loma Linda*, 24 Cal.4th 61, 69-70 (2000).

1    no default shall be taken against him or her, but the Labor Commissioner shall hear the evidence

2    offered and shall issue an order").

3         Nonetheless, issue preclusion does not assist Lloyd, as the issue being litigated in this

4    action is not identical to that previously decided.  The issue decided by the hearing officer was

5    whether Lloyd was entitled to a commission.  The issue here is whether Conseco's decision to

6    discharge her was retaliatory, and secondarily, whether it should have included the Williams loan

7    in her monthly production numbers.  Consequently, admission of the evidence turns on the

8    balancing required under Rule 403.

9         As the probative value of the Labor Commissioner's determination is slight, and the risk

10   of unfair prejudice and juror confusion is great, the court must exclude evidence of the

11   commission decision.  *United States v. Hitt*, 981 F.2d 422, 424 (9th Cir. 1992) ("Where the

12   evidence is of very slight (if any) probative value, it's an abuse of discretion to admit it if there's

13   even a modest likelihood of unfair prejudice or a small risk of misleading the jury").

14

15                              **III. CONCLUSION**

16        For the forgoing reasons, Lloyd's motion to exclude the opinions of Conseco's expert, Dr.

17   Robert Wunderlich, is granted in part and denied in part.  Wunderlich may testify regarding the

18   average length of time loan originators remained employed at Conseco.  He may not correlate

19   length of employment to loan production, testify that Lloyd's termination was caused by her poor

20   performance or opine that her termination was "consistent with her level of performance."

21   Wunderlich may also opine that Lloyd would have been terminated within five months of her

22   actual termination in September 1999 had she remained with the company.  In stating his

23   opinions, Wunderlich must use terminology that does not lead the jury to believe that employees

24   who departed voluntarily were in fact involuntarily terminated that plaintiff's termination was

25   consistent with her performance.

26

27

28

1          Conseco's motion to exclude evidence of the determination of the California Labor

2  Commissioner regarding Lloyd's entitlement to a commission on the Williams loan is granted.

3

4  DATED: October 18, 2001

                                        _Margaret M. Morrow_

5                                       MARGARET M. MORROW
                              UNITED STATES DISTRICT JUDGE